UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

FREDONIA FARMS, LLC, a Michigan
limited liability company; FRANK K.
ZINN, KARL ZINN, DONALD ZINN;
SUSAN EISINGER; and MARK FALANGA,
individually and as joint venturers,

        Plaintiffs,

v.                                  Case No. 1:12-CV-1005

ENBRIDGE ENERGY PARTNERS, L.P.,        HON. GORDON J. QUIST
et al.,

        Defendants.
_____/

## OPINION

      This case arises from an oil pipeline leak that resulted in the release of crude oil into Talmadge Creek and the Kalamazoo River. The named defendants are various entities in the Enbridge corporate structure that owned, operated, controlled, or maintained the pipeline (collectively, Enbridge) , and PII (Canada), a company that inspected the pipeline.  The plaintiffs are Fredonia Farms, LLC (Fredonia Farms), members of the Zinn family (the Zinn Plaintiffs), who are also members of Fredonia Farms, and Mark Falanga, a businessman involved in a land development project with the other plaintiffs.  Plaintiffs have asserted the following claims against Enbridge: (1) negligence; (2) gross negligence; (3) nuisance; (4) strict liability for abnormally dangerous activity; (5) strict liability under the Oil Protection Act (OPA), 33 U.S.C. § 2701 *et seq.*; (6) conversion; and (7) unjust enrichment.[1]  Plaintiffs seek compensatory damages, consequential damages, property damages, economic damages, exemplary damages, and lost profits.

_____

[1] Plaintiffs have asserted a negligence claim against PII, and PII has moved for summary judgment.  PII's motion will be handled in a separate opinion.

Enbridge has moved for summary judgment on Plaintiffs' claims for lost profits and exemplary damages, as well as Plaintiffs' claims for conversion, unjust enrichment, and strict liability under state law.  Plaintiffs have moved for summary judgment on their claim under the OPA.  The Court has reviewed the parties' extensive briefing and has held oral argument.  For the reasons that follow, the Court will grant Plaintiffs' motion as to Enbridge's liability under the OPA.  The Court will also grant Enbridge's motion as to loft profits and exemplary damages, but deny the motion as to Plaintiff's conversion, unjust enrichment, and strict liability claims.

## *I. Background*

A.    The Enbridge Oil Spill

On July 25, 2010, Line 6B, a pipeline owned and operated by one or more of the Enbridge entities, ruptured near Marshall, Michigan, and began to leak.  (Dkt. #322-1 at Page ID #6341.)  The alarms associated with the leak were not recognized as a line-break, and the leak was not addressed for 17 hours.  (*Id.*)  During that time, Enbridge twice tried to restart the pipeline, pumping thousands of barrels of oil into the line in the process.  (*Id.*)  The accident resulted in the release of over 20,000 barrels of diluted bitumen, or heavy crude oil.  (*Id.*)  The oil flowed into Talmadge Creek, which runs across the northeast side of property that was previously owned by the Zinn Plaintiffs' parents (the Zinn Property).  (*Id.*)

B.    The Zinnyard

The Zinn Property is a 420-acre piece of under-developed property located near Marshall, Michigan that was owned by members of the Zinn family for 80 years.  (Dkt. #349-2 at Page ID #7564.)  The Zinn Property was previously held in trust for the Zinn Plaintiffs (the Zinn Trust). (Dkt. #364-5 at Page ID #7287-89.)  In 1998, Frank K. Zinn, the trustee for the Zinn Trust, executed a quit-claim deed to Fredonia Farms, an entity that the Zinn Plaintiffs created to develop the Zinn Property.  (*Id.*; dkt. #348-5 at Page ID #7460.)

In September 2007, Falanga, a friend of the Zinn family, presented the Zinn Plaintiffs with a proposal to develop the Zinn Property as a community vineyard, to be known as the Zinnyard. (Dkt. #364-4.)  Falanga is the previous president of the Chicago-based Merchandise Mart, and has extensive experience in real estate.  (*Id.* at Page ID #8421.)  Falanga drafted a business plan that contemplated that the property would be divided into 200 one-acre lots, which would sell for an average of $100,000 each.  (*Id.* at Page ID #8423.)  Owners would be able to grow grapes and make their own wine, which would "open up vineyard ownership to many more people."  (*Id.*)  The development would include a winery, event space, a retail space, a resort, and a restaurant.  (*Id.*)

Falanga's plan was structured to "impose[] minimal financial burden and risk on the Zinn family."  (*Id.* at Page ID #8424.)  As such, the plan anticipated that "capital improvements [would] be drawn from the development proceeds rather than from existing Zinn family reserves" so that there would be a "minimal cash outlay" from the Zinn family.  (*Id.*)  The plan acknowledged that the biggest obstacle was that interested buyers would be unwilling to commit to purchasing a lot before grapes were planted or infrastructure was built.  (*Id.* at Page ID ##8447-8448.)  The Zinn Plaintiffs and Falanga agreed that Falanga would receive a 20 percent interest in the project once lots were sold and the project was a "go."  (Dkt. #327-3 at Page ID #6548.)

Over the next year, Plaintiffs assembled a team to pursue the Zinnyard project.  (Dkt. #348-2 at Page ID ##7405-06.)  They hired Peter Gamble, a viticulture consultant, to evaluate the Zinn Property for its suitability to grow wine grapes.  (Dkt. #350-4 at Page ID #7608.)  Gamble estimated that vinifera grapes, which are associated with premium wines, could be grown on roughly one-third of the property.  (*Id.* at  Page ID #7612.)  Plaintiffs also brought in a community planning firm, an architectural firm, and a real estate broker.  (Dkt. #348-3 at Page ID #7419.)  Fredonia Farms paid those and other consultants over $129,000 from its bank account.  (Dkt. #349-2 at Page ID #7565.)

3

Plaintiffs took other steps to further the project.  They met with Fredonia Township officials to discuss a zoning change, communicated with the City of Marshall's economic development director, and completed a site plan.  (Dkt. #348-5 at Page ID #7459.)  Plaintiffs also made changes to the original development plan.  They decided that lots should be 3/4 acre and sell for an average of $150,000.  (Dkt. #329-2 at Page ID #6648; dkt. #327-2 at Page ID #6537.)  They also decided that, rather than financing infrastructure construction through the sale of lots, they would obtain reservations for lots from buyers, which they would use to obtain financing from banks.  (Dkt. #348-2 at Page ID #7413; dkt. #348-3 at Page ID #7425.)  If they were unable to obtain such financing, Falanga had a "prospective pool of private investors" that he could have approached.  (Dkt. #348-2 at Page ID #7414.)  Members of the Zinn family also would have been willing to invest up to $2.5 million in personal funds.  (Dkt. #351-4 at Page ID #7674; dkt. #349-4 at Page ID #7580; dkt. #348-5 at Page ID #7467.)  Although Falanga had significant personal funds, there is no evidence that he would have been willing to invest in the project personally.  (Dkt. #364-3 at Page ID #8415.)

In late 2008, Plaintiffs decided to postpone bringing the project to market due to the downturn in the economy.  (Dkt. #348-2 at Page ID ##7406-07.)  Two months before the oil spill, Falanga confirmed to the Zinnyard team that he advised maintaining a "holding pattern" until the marketplace regained confidence, and that he "tentatively" planned to begin a marketing campaign in February 2011, although he would "continue to monitor market conditions closely."  (Dkt. #329-5 at Page ID #6662.)

When the spill occurred, Plaintiffs had not begun marketing the Zinnyard concept and did not have a set date to begin marketing.  (*Id.*)  They had not begun construction and had not planted a single grape.  (Dkt. #327-2 at Page ID ##6519, 6529.)  They had not completed the necessary zoning changes or submitted applications for water and sewer.  (*Id.* at Page ID #6521; dkt. #351-4

at Page ID #7673; dkt. #309-5 at Page ID ##6011-13.) They did not have any financing commitments and had not sold a single lot.  (Dkt. #327-2  at Page ID #6528.)  Plaintiffs and other members of the Zinnyard team believe that such developments were likely to occur if the oil spill had not happened.  Following the spill, however, Plaintiffs abandoned the idea of developing the Zinn Property because they believed they could not attract buyers or obtain financing due to the stigma of the oil spill.

## II.  Legal Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.  Enbridge's Motion for Summary Judgment

A.    <u>Damages</u>

Plaintiffs seek compensatory and consequential damages, including lost profits, for their state and federal claims.  Enbridge has moved for summary judgment on Plaintiffs' claim for lost profits,

arguing that such damages are speculative both as to their fact and their amount.[2]  The Court will

grant Enbridge's motion.

In determining the damages recoverable in an action for negligent destruction of property,

Michigan follows the rule set forth in *O'Donnell v. Oliver Iron Mining Co.*, 262 Mich. 470, 247

N.W. 720 (1933).  *Price v. High Pointe Oil Co.,* 493 Mich. 238, 244, 828 N.W.2d 660, 664 (2013).

That rule provides:

> If injury to property caused by negligence is permanent or irreparable, [the] measure of
> damages is [the] difference in its market value before and after said injury, but if [the] injury
> is reparable, and [the] expense of making repairs is less than [the] value of the [the] property,
> [the] measure of damages is [the] cost of making repairs.

*Id.* (alteration in original).  A plaintiff whose property is damaged may also be entitled to damages

for lost profits related to a business on the property.  *See Murray v. Wolverine Pipe Line Co.*, No.

257121, 2005 WL 3556148 (Mich. Ct. App. Dec. 29, 2005) (per curiam).

As an initial matter, there is some confusion as to whether Plaintiffs are claiming damages

for lost profits, or damages to the "Zinnyard Asset."  Plaintiffs rely on an expert report from Charles

Hewlett, who concluded that the value of the "Zinnyard Asset" was roughly $14 million.[3]  In

concluding his valuation of this "unique" community, Hewlett assumed that the Zinnyard would

---

[2]Enbridge asserts that the OPA similarly prohibits awarding lost profits that are speculative.  Plaintiffs have
not disputed that assertion.  Moreover, although there is no case law directly on point, cases interpreting other federal
statutes have held that lost profits must be reasonably certain.  *See Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir.
2002) (rejecting district court's award of lost profits under the Lanham Act because it was speculative).  Under federal
law, proof of the fact of damages must be established with reasonable certainty, although the amount of damages may
be estimated, provided it is not merely speculative.  *Id.*  Accordingly, the Court's analysis of lost profits applies to
Plaintiffs' federal and state law claims.

[3] Hewlett, a real estate appraiser, identified "three common and acceptable approaches to real estate valuation:
the Economic or Income Approach, the Comparable Sales or Sales Comparison Approach, and the Replacement Cost
Approach."  (Dkt. #455-2 at Page ID #11727.) For various reasons, including the "unique nature of the community,"
Hewlett rejected the Comparable Sales Approach and Replacement Cost Approach.  He concluded that the income
approach to valuation was the most appropriate, and used the "Discounted Cash Flow" method to determine the
"Zinnyard Asset's" Net Present Value, assuming that the pipeline rupture did not occur.

have obtained the necessary zoning changes, complied with all environmental requirements, obtained financing for infrastructure, planned and completed the necessary infrastructure (including streets and utilities), successfully marketed the development to wine lovers, obtained financing sources for purchasers of the lots, planted a vineyard, produced a quality wine that would be consumed and sold, built a successful retail shop, and opened a profitable restaurant, among other things.  Furthermore, Hewlett anticipates that the lots would not be all sold until 2016, when no one could predict the economy.  Hewlett then valued the damage to the 400 acres of property not as damage to the land itself, but as the projected financial loss incurred because Plaintiffs cannot realize their dream of building a unique community of vineyards with a successful wine producing facility, retail space, and restaurant.  Although Hewlett's report purports to value an asset, he essentially projects lost profits for the Zinnyard, a business that has never existed.  Thus, regardless of what label is used, Plaintiffs' claim is essentially one for lost profits from the Zinnyard, a development that had not yet begun construction or gone to market.[4]

Under Michigan law, "[f]or a plaintiff to be entitled to damages for lost profits, the losses must be subject to a reasonable degree of certainty and cannot be based solely on mere conjecture or speculation." *Bonelli v. Volkswagen of Am.*, 166 Mich. App. 483, 511, 421 N.W.2d 213, 226 (1988).  However, courts do not require mathematical certainty.  *Id.*  On the contrary, lost profits are permitted even where they "are difficult to calculate and are speculative to some degree." *Id.* "The type of uncertainty which will bar recovery of damages is 'uncertainty as to the fact of the damage and not as to its amount . . . [since] where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.'"  *Id.* (quoting *Wolverine*

---

[4]In briefing and at oral argument, Plaintiffs have identified this claim as one for lost profits.

*Upholstery Co. v. Ammerman*, 1 Mich. App. 235, 244, 135 N.W.2d 572, 576 (1965) (alteration in original)).

Michigan allows lost profits for new businesses as long as they may be established with "reasonable certainty." *Fera v. Vill. Plaza, Inc.*, 396 Mich. 639, 644, 242 N.W.2d 372, 374 (1976). Although Michigan courts have not explicitly listed the types of evidence that may be used to demonstrate lost profits for a new business, courts in other states have examined expert reports, market analyses, comparisons to similar businesses operating under similar market conditions, and economic and financial data.  11 Corbin on Contracts § 56.17 (2012).  *See also Andrew v. Power Mktg. Direct, Inc.*, 978 N.E.2d 974, 992 (Ohio Ct. App. 2012); *Mrozek v. Intra Fin. Corp.*, 281 Wis. 2d 448, 478, 699 N.W.2d 54, 68 (Wis. 2005); *Kaech v. Lewis Cnty. Pub. Util. Dist. No. 1*, 106 Wash. App. 260, 277, 23 P.3d 529, 539 (Wash. Ct. App. 2001).  In general, a new business may recover lost profits "[w]here estimates of lost profits are based on objective facts or data and there are firm reasons to expect a business to yield a profit."  22 Am. Jur. 2d Damages § 459.

In support of their motion, Defendants rely primarily on the Michigan Court of Appeals' opinion in *Murray v. Wolverine Pipe Line Co.*, 2005 WL 3556148.  In that case, a pipeline owned by the defendant burst onto property owned by the plaintiff.  *Id.* at *1.  At the time of the spill, the plaintiff was preparing to open a foster care facility on the property.  *Id.*  The lower court granted the defendant summary judgment on the plaintiff's claim for lost profits, and the court of appeals affirmed.  *Id.* at *2.  The court explained that the plaintiff had presented only his business plan and an affidavit from an accountant that the business would have been successful, and that such evidence was insufficient to show with reasonable certainty that the business lost profits of any amount due to the defendant's actions.  *Id.*  Morever, the court noted, the defendant had presented evidence that the business had not been profitable once it finally opened.  *Id.*

8

Plaintiffs argue that *Murray* is not applicable because that court had evidence before it that the business was not profitable once it opened. Rather, Plaintiffs rely on the Michigan Supreme Court's decision in *Fera*, 396 Mich. 639, 242 N.W.2d 372. In that case, the plaintiff executed a lease for a "book and bottle" shop in the defendant's proposed shopping mall. *Id.* at 641, 242 N.W.2d at 373. The defendant later leased the same premises to another tenant, thereby preventing the plaintiff from opening his shop on the premises. *Id.* A jury awarded the plaintiff damages, and the Michigan Court of Appeals reversed the award because "the trial court erroneously permitted lost profits as the measure of damages for breach of the lease." *Id.* at 642, 242 N.W.2d at 373 (internal quotations omitted). The Michigan Supreme Court reversed the Court of Appeals.

The Court explained that a new business may recover anticipated lost profits, but that "the plaintiff must lay a basis for a reasonable estimate of the extent of his harm." *Id.* at 643, 242 N.W.2d at 373-74. Future lost profits are allowed only if "they may be established with reasonable certainty." *Id.* at 644, 242 N.W.2d at 374. For an established business, "a reasonable prediction can often be made as to its future on the basis of its past history." *Id.* However, if the business "has not had such a history as to make it possible to prove with reasonable accuracy what its profits have been in fact, the profits prevented *are often but not necessarily too uncertain for recovery*." *Id.* (emphasis added). Thus, the question becomes whether the instant case falls into the "reasonably certain" category or the "too uncertain for recovery" category. In this Court's judgment, the instant case falls into the latter.

The *Fera* court explained that the key to determining whether profits are uncertain is the quality of the evidence:

> [T]he term 'speculative and uncertain profits' is not really a classification of profits, but is instead a characterization of the evidence that is introduced to prove that they would have been made if the defendant had not committed a breach of contract. The law requires that

> this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference, leaving the damages to be determined by sympathy and feelings alone.

*Id.* at 644, 242 N.W.2d at 374. The court noted that, in that case, the parties had presented days of testimony on the issue of lost profits. *Id.* at 645, 242 N.W.2d at 374. The parties presented testimony from experts with experience in the liquor sales and book sales businesses, representatives from liquor distribution firms in the area, and owners of drug and book stores. *Id.* Those witnesses produced figures regarding sales for similar business in the same area. *Id.* at 645, 242 N.W.2d at 374-75. The plaintiff himself presented evidence from other bookstores that he owned at the time. *See Fera v. Vill. Plaza, Inc.*, 52 Mich. App. 532, 536, 218 N.W. 2d 155, 157 (1974). The court explained that such testimony took the issue of lost profits "from the category of speculation and conjecture" and "placed it in the position of those cases that hold that even though loss of profits is hard to prove, if proven they should be awarded by the jury." *Fera*, 396 Mich. at 646, 242 N.W.2d at 375.

Plaintiffs argue that *Fera* is directly applicable to the instant case because the bookstore owner in *Fera* had only a venue for his business and nothing else—no product to sell and no infrastructure for his store. However, there are important distinctions between the facts, as well as the evidence, in the two cases:

- In *Fera*, the real estate was actually ready for occupancy for its intended purpose. In fact, the landlord wrongfully leased the space to another tenant. In the instant case, Hewlett predicted that, if the oil spill had not occurred and everything else had gone perfectly, the Zinnyard would not have begun selling lots until 2013—three years after the oil spill.

- Although Plaintiffs owned the property where the Zinnyard was to be developed, they had not obtained the necessary zoning or infrastructure that would have allowed them to develop

the property.  In contrast, the plaintiff in *Fera* had a lease for a retail space that was ready to house his store.  Although he did not have a liquor license, he had all the other necessities to open his business and make it a success.

- At the time of the oil spill, the Zinnyard project was on hold due to the economic downturn. In contrast, the plaintiff in *Fera* intended to, and had the ability to, open a store once he had a retail space.

- Plaintiffs cannot point to any other comparable business to provide a basis to demonstrate the Zinnyard's lost profits.  Hewlett's report acknowledges that there are no "precise and exact comparables to the Zinnyard community."  (Dkt. #333-3 at Page ID #6810.)  In fact, Hewlett could not find a single development in the United States in which property owners had their own small vineyard.  (*Id.*)  The closest analogue that he found was a community vineyard in Argentina, but the Argentine property did not include a residential component. (*Id.*)  In contrast, the plaintiff in *Fera* had his own and other comparable businesses to use as a basis for projecting lost profits.

- Plaintiffs cannot provide testimony from witnesses that have expertise about community vineyards, since this is a business model that is unique in the world and has never been tested.  The only other "experts" in this case are members of the Zinnyard team, who may have a genuine belief that the business would have been a great success, but no empirical basis for this belief.  In contrast, the plaintiff in *Fera* presented testimony from experts in the book and liquor business.

Thus, the evidence that took *Fera* from the category of speculation and conjecture is simply not present in this case.

The uncertainty in this case does not go merely to the amount of lost profits, but to their very fact.  Hewlett assumed that this "unique" development would be a success, and he bases his

11

valuation on that assumption.  As such, he never considered developments that have failed in his analysis.  Whether Plaintiffs would have successfully completed all the steps necessary to open the Zinnyard and found buyers, let alone made the whole development profitable, is a matter of pure speculation.  Even if Hewlett's report were probative as to the amount of damages, it does not provide insight into the fact of damages.[5]

Plaintiffs argue that several individuals, including members of the Zinnyard team, would testify that they believe that the Zinnyard would have been a success.  However, those individuals have no experience with a development like the Zinnyard, since it was to be the first of its kind.  The crux of Plaintiffs' argument seems to be that the Zinnyard had such an impressive team of individuals working on its behalf that it was guaranteed to succeed.  Plaintiffs have particularly pointed to Falanga's history of success, painting him as a sort of King Midas of the business world, whose every project turns to gold.  However, the Midas touch argument is simply not sufficient to take damages from the realm of speculation.  The Court does not doubt that the Zinnyard team was impressive, or that Falanga has had an extensive history of success.  However, even the most talented and successful among us experience failure, particularly upon entering uncharted territory, and especially again in the real estate development business.

Falanga has compared the Zinnyard project to "Apple creating the iPad before anyone knew what the iPad was or existed."  (Dkt. # 306-3 at Page ID #5805.)  However, the Zinnyard could just as easily be compared to "Lisa," a project that Steve Jobs undertook for Apple decades prior to the unveiling of the iPad.  Lisa, one of the earliest personal computers, was regarded as an epic failure, and resulted in Jobs being ousted from Apple.  *See* Nick Schulz,  Steve Jobs: America's Greatest Failure,  NATIONAL REVIEW ONLINE,  Aug.  25,  2011,  available  at

---

[5] As will be discussed in a separate order, the Court will grant Enbridge's motion to exclude Hewlett's testimony because it is not relevant to the issues in this case and is not reliable.

http://www.nationalreview.com/articles/275528/steve-jobs-america-s-greatest-failure-nick-schulz.
Would the Zinnyard have been the next iPad, or the next Lisa?  It is impossible to know.  A jury
could only speculate, and that the law prohibits.

Plaintiffs have failed to provide a single market study demonstrating that they would have
been able to find buyers for the Zinnyard lots.  When asked about the lack of market research,
Falanga responded that it would have been a "waste of money and effort" because the Zinnyard was
something entirely new that would have created new desires and habits in its intended market.  In
essence, a market study would have been worthless because people could not know whether they
would want to travel to Marshall for vineyard living, since it was something that had never been
done before or imagined.  Even though Plaintiffs admit that their targeted purchasers could not know
whether they would be willing to purchase lots, they argue that a jury could determine the
marketability of the Zinnyard with reasonable certainty.  That argument is untenable.

There is little evidence that the Zinnyard project would have ever gotten off the ground, let
alone been a success.  When the oil spill occurred, the development was in a "holding pattern," and
it was unclear when Plaintiffs would take it to market.  Plaintiffs were able to put the project on hold
because there were no "carry costs to it," or "pressure from a group of investors pushing to move
ahead."  (Dkt. # 348-2 at Page ID #7403.)  Those same factors mean that Plaintiffs could have
abandoned the project forever without consequences.  Unlike the plaintiff in *Fera*, who had entered
into a contract to lease a location for his bookstore, Plaintiffs had no contracts or commitments that
would have obligated them to take the Zinnyard to market.

Furthermore, Plaintiffs did not have the financing necessary to begin construction on the
Zinnyard.  Plaintiffs have asserted that a number of factors indicate that the project was viable: it
was to be built of an ideally suited piece of land, it had a solid business plan, it had a development

team, the development team had undertaken efforts to prepare to go to market, and it had community support, among other things.  Even assuming all those factors existed, Plaintiffs still needed the money to begin construction.  Plaintiffs have asserted that financing was no problem—they would have found financing, and if all else failed, Falanga could have saved the day by financing the project himself.  However, that assertion is not supported by the record.  While Falanga has indicated that he *could* have financed the project himself, the Court is unaware of anything in the record indicating that he *would* have done so.  In his deposition, Falanga stated: "You know, I could have invested a lot.  Would I have done that is another question."  (Dkt. #364-3 at Page ID#8416.)  When pressed to state how much he would have invested Falanga stated: "I don't want to answer that so specifically."  (*Id.*)

In the end, the Zinnyard was simply a novel concept that did not have the chance to develop.  The Zinnyard had not obtained necessary permits, begun construction, planted a single grape, or made a single sale.  The Court recognizes that Plaintiffs lost the opportunity to develop that concept through no fault of their own.  However, even if Plaintiffs were "robbed of the opportunity forever to attain the profits that [they] would have made from selling parcels, selling homes, and running a series of operating businesses," as Falanga has asserted (dkt. #306-3 at Page ID #5807), that does not necessarily mean that they may be compensated for the loss of that opportunity.  To obtain damages for their lost opportunity, Plaintiffs must demonstrate with reasonable certainty that the project would have gone to market, and that it would have been profitable.  They have not done so.

Finally, the Court rejects Plaintiffs' argument that the issue of damages should go to a jury.  As the Michigan Supreme Court has made clear, the Court—and not a jury—must determine whether the evidence presented regarding lost profits is speculative.  From the case upon which Plaintiffs rely:

The loss of profits are often speculative and conjectural on the part of witnesses. When this is true, *the Court should deny loss of profits because of the speculative nature of the testimony and the proofs*.

*Fera*, 396 Mich. at 646, 242 N.W.2d at 375 (emphasis added). As such, a Court should grant summary judgment if a plaintiff has not presented evidence to take the fact of lost profits beyond the realm of speculation. *See Murray*, 2005 WL 3556148, at *2. Plaintiffs have not presented such evidence.

Plaintiffs are seeking damages for being "robbed" of their dream to create a new kind of residential development. They believe that this development would have been a tremendous success, but their only evidence is based on speculation and conjecture. Taking the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could not find the fact of lost profits with reasonable certainty. Accordingly, Plaintiffs may not pursue a claim for lost profits or damages to the so-called Zinnyard asset.

B.    Real Party in Interest

Rule 17(a) requires an action to be prosecuted by the real party in interest. Fed. R. Civ. P. 17(a). "[T]he real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters v. Layne*, 26 F.3d 39, 42-43 (6th Cir. 1994). Enbridge argues that none of the plaintiffs is the real party in interest because none of the plaintiffs own the Zinn Property. *See Walgreen Co. v. Macomb Twp.*, 280 Mich. App. 58, 65, 760 N.W. 2d 594, 598 (2008) (in cases involving real property, the owner of the property is the real party in interest).

It is undisputed that the Zinn Trust is the record owner of the Zinn Property, and that the Zinn Trust executed a quit-claim deed to Fredonia Farms that was never recorded. (Dkt. #346-5 at Page ID ##7288-90; dkt. #347-1 at Page ID ##7298-7300.) Enbridge argues that the deed did not

effectively convey the property to Fredonia Farms because it did not contain a description of the property. However, Plaintiffs have provided a deed with an attached description of the property, along with an affidavit from Frank K. Zinn stating that he prepared the description at the same time as the original deed. (Dkt. #347-1 at Page ID ##7295-96.) Enbridge has provided no evidence to the contrary. Accordingly, the Court finds that the deed was effective, and that Fredonia Farms owns the Zinn Property.

The individual plaintiffs argue that, although they do not own the Zinn property, they are parties in interest as joint venturers in the Zinnyard project. This argument cannot succeed in light of the Court's ruling that Plaintiffs may not seek lost profits or losses to the Zinnyard asset. Furthermore, the Zinn Plaintiffs' argument that they are real parties in interest based on their ownership of Fredonia Farms, LLC is at odds with Michigan law. *See* M.C. L. § 450.4510 (members of an LLC may not sue for claims of the LLC unless the LLC refuses to sue). The only party that may enforce the rights asserted in this case is the owner of the Zinn Property, Fredonia Farms. Accordingly, the individual plaintiffs will be dismissed from this case.

C.    Conversion

Plaintiffs allege that Enbridge destroyed 400 trees on the Zinn Property during clean-up efforts following the oil spill, and is thus liable for conversion. *See* M.C.L. § 600.2919 (any person who "despoils or injures any trees on another's lands" without permission is liable for treble damages). Enbridge has moved for summary judgment on this claim, arguing that it is really a breach of contract claim recast as a tort claim.

"In Michigan, an action in tort requires a breach of duty separate and distinct from a breach of contract." *Haas v. Montgomery Ward & Co.*, 812 F.2d 1015, 1016 (6th Cir. 1987). Enbridge argues that Plaintiffs' claims are really claims that Enbridge breached two different contracts: (1)

16

an access agreement allowing Enbridge to enter the Zinn Property to clean up from the oil spill; and (2) an amendment to the access agreement providing that Enbridge would pay Fredonia Farms $27,000 in consideration for the removal of up to 27 trees, and would not remove any other trees without consent. (Dkt. #313-3 at Page ID #6169; dkt. #313-4 at Page ID #6178.) However, Enbridge's duty not to destroy the trees did not arise from those contracts, but rather arose independently by virtue of common law and Michigan statute. *See* M.C.L. § 600.2919. Accordingly, Enbridge is not entitled to summary judgment on this claim.

D.     Unjust Enrichment

Plaintiff alleges that Enbridge took water from lakes on the Zinn Property to pressure test Line 6B after the oil spill, and that Enbridge was unjustly enriched as a result. Enbridge has moved for summary judgment on this claim, arguing that it had contract rights to use the Zinn Property, the lakes have returned to their previous levels, and that there is no evidence that Enbridge was enriched by use of the water.

Under Michigan law, the elements of an unjust enrichment claim are "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Barber v. SMH (US), Inc.*, 202 Mich. App. 366, 375, 509 N.W. 2d 791, 796 (1993). If those elements are satisfied, a court will find an implied contract if there is no express contract covering the same subject matter. *Id.*

The contract that Enbridge cites simply provides it with a right of ingress and egress to report and reconstruct Line 6B—it does not give Enbridge the right to take anything from the property. Furthermore, although the lakes eventually returned to their former levels, draining them without compensating Fredonia Farms was inequitable. Finally, Enbridge received a benefit in the form of water that allowed testing of Line 6B. Accordingly, Enbridge is not entitled to summary judgment on this claim.

E.  Exemplary Damages

"Exemplary damages are recoverable only for intangible injuries or injuries to feelings, which are not quantifiable in monetary terms." *Unibar Maint. Servs., Inc. v. Saigh*, 283 Mich. App. 609, 630, 769 N.W. 2d 911, 923 (2009). Exemplary damages are not recoverable if a party may be made whole through monetary compensation. *Id.* Although a corporation does not have "feelings," a corporation may recover exemplary damages based on harm to its reputation or a loss of goodwill. *Id.* at 630-631, 760 N.W. 2d at 924.

Fredonia Farms has not sustained harm to its reputation or loss of goodwill. Because it had not begun marketing the Zinnyard, it had no reputation to harm or good will to lose. Accordingly, the Court finds that Fredonia Farms can be made whole through monetary compensation and may not pursue exemplary damages.[6]

F.  Abnormally Dangerous Activity

Plaintiffs allege that Enbridge is strictly liable for the oil spill because it was carrying out an abnormally dangerous activity in transporting dilbit. *See* Restatement (Second) of Torts § 520. The Court is unaware of any other court that has previously addressed this precise issue. As discussed in the following section, the Court finds that Enbridge is strictly liable for the activities at issue under the OPA. As such, the Court concludes that it is unnecessary to determine whether Enbridge is also strictly liable under the "abnormally dangerous activity" doctrine at this time.

### IV. Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment on their claim that Enbridge is strictly liable under the OPA. The OPA provides that

---

[6]The individual plaintiffs cannot assert a claim for exemplary damages. The only source of injury in this case was the oil spill on the Zinn Property. The individual plaintiffs did not own the property or have any rights to the property. Thus, they have no more claim to exemplary damages for injuries to that property than would a visitor to the property who was offended by the oil contamination.

each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).  The damages specified in subsection (b) include:

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases the property.

33 U.S.C. § 2702(b)(2)(B).[7]

Under the OPA, a claim for damages must be presented to the party responsible for the oil spill.  33 U.S.C. § 2713(a).  If the responsible party denies liability or the claim is not settled within 90 days, the claimant may file an action against the responsible party.  33 U.S.C. § 2713(c).  "The purpose of the claim presentation procedure is to promote settlement and avoid litigation." *Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 310 (E.D. Va. 1993).

Enbridge does not dispute that it was the "responsible party" for purposes of the OPA. Rather, it argues that any claim under the OPA is barred because the Zinn Property was not destroyed.  Enbridge further argues that Fredonia Farms presented its claim only to Enbridge Energy, Limited Partnership (EELP), and thus may not assert a claim against the other Enbridge Defendants.[8]

A.    Damages under § 2702(b)(2)(B)

Under § 2702(b)(2)(B), an owner of real property may recover "[d]amages for injury to, or economic losses resulting from destruction of" such property.  Enbridge argues that Fredonia Farms

---

[7]The OPA also allows "any claimant" to recover damages for lost profits due the injury of real property.  33 U.S.C. § 2702(b)(2)(E).  As discussed previously in this Opinion, however, lost profits are not recoverable because they are speculative.

[8]In addressing Enbridge's motion for summary judgment, the Court ruled that Fredonia Farms owned the Zinn Property, that the individual plaintiffs may not pursue claims against Enbridge, and that lost profits are not recoverable. The Court will address only those arguments related to the OPA that are still standing in light of those rulings.

may not assert a claim for damages under that subsection because the Zinn Property was not destroyed.

As an initial matter, the Court notes that § 2702(b)(2)(B) allows a property owner to recover damages for "injury to" the property. Fredonia Farms appears to be seeking such damages, as it asserted a claim for "all damages to the property" under the OPA in its complaint. Fredonia Farms may also seek "economic losses resulting from destruction" of the Zinn Property. Even if Enbridge is correct that only a small portion of the property was contaminated, it has provided no legal support for its proposition that the entire piece of property owned by an OPA plaintiff must be destroyed. In fact, the sparse case law that touches on the issue indicates the opposite. *See South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 68 (1st Cir. 2000) (upholding a jury award for economic losses including goodwill and business stress, although only a portion of the plaintiff's property was destroyed); *Seaboats, Inc. v. Alex C Corp.*, Nos. Civ.A. 01-12184-DPW, 01-12186-DPW, 00-12500-DPW, 2003 WL 203078, at *5 (D. Mass. Jan. 30, 2003) (noting that the "plain language" of the OPA was not so constrained as to prevent a plaintiff from seeking economic damages because its vessel was only temporarily prohibited from leaving port). Accordingly, the Court finds that Fredonia Farms may seek damages under § 2702(b)(2)(B).

B.      Claims against Enbridge Entities other than EELP

Enbridge asserts that, even if Fredonia Farms had a valid OPA claim, it presented its claim to EELP only, and thus it may not assert a claim against the remaining Enbridge Defendants. However, Fredonia Farms' initial claim presentation letter stated that the claim was presented to "Enbridge Energy and its related affiliates and entities." (Dkt. #304-5 at Page ID #5600.) The fact that only EELP responded to the claim and engaged in settlement negotiations does not prevent Fredonia Farms from pursuing a claim against the other Enbridge entities. *See* 33 U.S.C. § 2713(c) (a claimant may file an action against a responsible party if the party denies liability or the claim is

not settled).  Accordingly, the Court finds that Fredonia Farms presented a claim to each of the Enbridge Defendants, and may pursue its OPA claim against those defendants.

### V.  Conclusion

The Court concludes that only Fredonia Farms, and not the individual plaintiffs, may proceed with this action.  Fredonia Farms has established that Enbridge was liable for the oil spill under the OPA, and may present its claim for damages under § 2702(b)(2)(B) to a jury.  However, Fredonia Farms may not seek lost profits from the Zinnyard or exemplary damages based on the spill. Fredonia Farms may proceed with its claims for conversion and unjust enrichment.  The Court presumes that Fredonia Farms need not proceed with its claim for strict liability under the "abnormally dangerous activity" doctrine in light of the Court's ruling on the OPA claim.

An order consistent with this Opinion shall issue.


Dated:  July 18, 2014                                            /s/ Gordon J. Quist
                                                              GORDON J. QUIST
                                                              UNITED STATES DISTRICT JUDGE